THE BOARD OF REVIEW OF THE COUNTY OF ALEXANDER, Petitioner-Appellant, v. THE PROPERTY TAX APPEAL BOARD et al., Respondents-Appellees.

Fifth District    No. 5—97—1089

Opinion filed May 11, 1999.

Jeffrey Farris, State's Attorney, of Cairo (Norbert J. Goetten, Stephen E. Norris, and Rebecca Sanders, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for petitioner.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Karen J. Diamond, Assistant Attorney General, of counsel), for respondent Property Tax Appeal Board.

A.M. Spradling III, of Spradling & Spradling, of Cape Girardeau, Missouri, for respondent Unimin Specialty Minerals.

PRESIDING JUSTICE RARICK delivered the opinion of the court:
Petitioner, the Board of Review of Alexander County (Board), appeals a decision of the Illinois Property Tax Appeal Board (PTAB) reducing the Board's assessed valuation of mineral reserves owned by Unimin Specialty Minerals (Unimin). Unimin owned 160,000 tons of proven reserves of microcrystalline silica, known by the geologic name "Tripoli," on a parcel of land in Alexander County known as the McCrite pit. A hearing before the PTAB was held on June 9, 1997. Seibert Cowley, the plant manager for Unimin's processing plants at Elco and Tamms, Illinois, testified that Unimin typically either buys the land where the deposits are located or leases the mineral rights, paying 35 cents to 50 cents per usable consumed ton. This is also referred to as a royalty fee. Unimin also pays additional fees to the landowners to maintain the lease. Unimin owned the McCrite pit but leased the mineral rights to the nearby Birk pit for 50 cents per ton.

Once the Tripoli was removed from the pit, the raw material was taken to one of the processing plants, where it was crushed, dried, screened, ground, and classified by size. Processing costs vary between $75 and $300 per ton, depending on the grade produced. The processed Tripoli was sold for an average of $250 per ton. The raw material could be sold as coarse aggregate for fill dirt for construction and landscaping. Processed Tripoli was used primarily for filler in paint.

Dorothy Mayberry, supervisor of assessments for Alexander County, testified before the PTAB that each year she requests from Unimin the annual tons, price per ton, and production cost expenses. She further testified that at one time Unimin had four pits in opera-

tion, but she had been told in April 1996 that only the McCrite pit was in operation. With respect to the 1996 assessment, Mayberry testified that she valued the mineral deposits by taking Unimin's 1995 sale of 60,263 tons of finished product at $189.90 per ton, which produced $11,447,559 in income, subtracting $6,759,531 of expenses, and capitalizing the $4,688,028 of net income at 25%, to derive a value of $6,750,760, which translated into an assessed value of $2,248,003. Unimin argued that the assessment should be based on the fair market value of the minerals before processing, which was 50 cents per ton.

The PTAB rejected the income method of valuation used by the Board, finding that the Board's method valued the business as opposed to the real estate. The PTAB noted that once the minerals were severed from the land they became personal property and were not subject to real estate assessment. The PTAB concluded that the methodology used by the Board assessed not only the value of the minerals but also the value added to them after they became personal property. The PTAB also found that some of the ore processed at the Elco plant, where the net income was established and capitalized into an estimate of value, was from sites other than the McCrite pit. The PTAB determined that the best evidence of the fair market value of the Tripoli deposits in the McCrite pit was the royalty fees for the most recent lease, on the Birk pit, which was 50 cents per ton. The PTAB determined that the correct assessed value was $27,488.

On appeal, the Board argues that the PTAB used an improper method of valuation which did not reflect the property's fair cash value and that its finding was erroneous as a matter of law. The Board maintains that section 9—145(d) of the Property Tax Code (Code) (35 ILCS 200/9—145(d) (West 1994)) provides that the assessment should be based on the fair cash value of the minerals in question and that the valuation method employed by the PTAB does not value the Tripoli at its fair cash value because it does not consider the income-earning potential of the minerals.

■ Section 9—145(d) of the Code provides in pertinent part:

"(d) Any property on which there is a coal or other mine, or stone or other quarry, shall be valued at 33$^{1}/_{3}$% of its fair cash value. Oil, gas[,] and other minerals, except coal, shall have value and be assessed separately at 33$^{1}/_{3}$% of the fair cash value of such oil, gas[,] and other minerals." 35 ILCS 200/9—145(d) (West 1994). The Code also provides that "fair cash value" is "[t]he amount for which a property can be sold in the due course of business and trade, not under duress, between a willing buyer and a willing seller." 35 ILCS 200/1—50 (West 1994). "Fair cash value" is synonymous with "fair market value." *Ellsworth Grain Co. v. Property Tax Appeal Board*, 172 Ill. App. 3d 552, 526 N.E.2d 885 (1988).

■ There are three methods used to evaluate property: (1) the comparison or market approach, which focuses on sales of comparable property, (2) the income approach, which is used when the property is most valuable as rental property, and (3) the reproduction- or replacement-cost method, which focuses on what it would cost to re-create real property with the same value. *Willow Hill Grain, Inc. v. Property Tax Appeal Board*, 187 Ill. App. 3d 9, 549 N.E.2d 591 (1989). Generally, the income approach should not be used unless the property is rented or rentable. *Board of Review v. Property Tax Appeal Board*, 104 Ill. App. 3d 859, 433 N.E.2d 692 (1982). The replacement-cost method should be used only where there is no actual or potential market for the property in question, and even then it should be only one factor in the valuation process and not the sole, conclusive method of valuation. *Chrysler Corp. v. Property Tax Appeal Board*, 69 Ill. App. 3d 207, 387 N.E.2d 351 (1979). Where there is evidence of comparable sales, the market approach should be used. *Willow Hill Grain, Inc.*, 187 Ill. App. 3d at 15, 549 N.E.2d at 596, citing *Chrysler Corp.*, 69 Ill. App. 3d at 212, 387 N.E.2d at 355.

Initially, we must determine the proper standard of review. The Board maintains that because the propriety of the method of valuation is at issue, we are faced with a question of law and that the PTAB's decision is subject to *de novo* review. The PTAB contends that the findings and conclusions of an administrative agency are *prima facie* true and correct and that the proper standard of review is whether the agency's findings and conclusions are contrary to the manifest weight of the evidence.

■ The decisions of the PTAB are subject to judicial review under the provisions of the Administrative Review Law. 735 ILCS 5/3—101 *et seq.* (West 1994). The Administrative Review Law limits the scope of judicial review by providing that the findings and conclusions of an administrative agency on questions of fact shall be *prima facie* true and correct. 735 ILCS 5/3—110 (West 1994); *County of Du Page v. Property Tax Appeal Board*, 277 Ill. App. 3d 532, 660 N.E.2d 985 (1995). Thus, the usual standard of review of an administrative decision is whether it is contrary to the manifest weight of the evidence, and a court will not intervene when there is simply a difference of opinion as to the actual value. Where the propriety of the method of valuation is challenged, however, the issue is one of law and the court reviews the agency's decision *de novo*. *Kankakee County Board of Review v. Property Tax Appeal Board*, 131 Ill. 2d 1, 544 N.E.2d 762 (1989). In the present case, the Board's challenge to the method of valuation the PTAB used in determining the value of the property in question is one of law, and we will apply the *de novo* standard.

The Board argues that the method of valuation utilized by the PTAB did not assess the Tripoli deposits at their fair cash value because it did not take into account the income-producing potential of the property. Relying on *Consolidation Coal Co. v. Property Tax Appeal Board of Department of Local Government Affairs*, 29 Ill. App. 3d 465, 331 N.E.2d 122 (1975), the Board contends that where market values cannot be determined or are not truly reflective of worth, other methods, such as "reproduction cost less depreciation" or "capitalization of income," are helpful. Citing *Kankakee County Board of Review*, the Board maintains that a property's income-earning capacity is the most significant element in determining property value.

In *Consolidation Coal Co.*, Consolidation Coal (Consolidation) challenged the Fulton County Board of Review's assessment of certain pieces of heavy machinery and of the coal-preparation plant. The PTAB found there to be insufficient evidence of market values for the equipment, much of which was obsolete and in disrepair, and utilized a "value in use" method of appraisal. Although it is unclear from the court's opinion, this appears to be a variation of the reproduction- or replacement-cost method. Under this "value in use" method, the original cost of the item was "trended" up to 1970 to derive a so-called "replacement" cost, and then a factor of depreciation was subtracted to arrive at a value. On appeal, the court did not reject the "value in use" concept, finding that it might be proper in instances where the property in question would have little or no value to an outside buyer. Rather, the court found that there was evidence of the existence of a market for most of the equipment and that a "value in use" estimate could have been derived by taking the market price and adding to it other relevant expenses. The PTAB, however, had determined a "value in use" assessment based upon a formulaic "reproduction cost less depreciation" method. The court ruled that the evidence established that there was a market for most of the items in dispute and that the assessor improperly relied upon a formula not explained in the record and not shown to have any relation to actual cash value.

In *Kankakee County Board of Review*, the Kankakee County Board of Review appealed a decision of the PTAB regarding the assessment of an apartment complex, arguing that the PTAB's assessment ignored a subsidy the complex received from the Illinois Housing Development Authority. On appeal, both parties agreed that the income approach to valuation was a reliable indicator of the property's fair market value, but they disagreed on the proper method of determining the gross income of the subsidized property. Thus, the issue before our supreme court was the proper method for calculating fair market value under the capitalization-of-net-income method of valuation. *Kankakee County*

*Board of Review*, 131 Ill. 2d at 14-15, 544 N.E.2d at 764. Our supreme court held that the PTAB erred as a matter of law when it failed to consider the effect of the subsidy agreement on the property's income-earning capacity.

Both *Consolidation Coal Co.* and *Kankakee County Board of Review* are inapposite. In *Consolidation Coal Co.*, the court rejected the variation of the "replacement cost" method used by the PTAB because, in the use of that method, elements such as depreciation, obsolescence, lack of marketability, age, life expectancy of the property, income-production capabilities, and condition and location were not taken into account and because there was nothing in the record to explain the formula or its relation to fair cash value. As noted in *Consolidation Coal Co.*, when there is no market, methods such as "reproduction cost less depreciation" and "capitalization of income" may be helpful but they are not determinative, and other factors such as income-production capabilities should be considered. The PTAB did not use a replacement-cost approach, however, nor would a cost approach have been appropriate under the circumstances. *Kankakee County Board of Review* is also inapposite because it involved the use of the income-capitalization method. As noted above, this method is appropriate only where the property in question is rented or rentable.

■ In the present case, the Board is arguing that the income approach should be used because income-production capabilities are the most important element in determining value. Income-production capability is the most important element to be considered if a method other than market value is being used, as they were in *Consolidation Coal Co.* and *Kankakee County Board of Review*. Methods other than market value should be used, however, only where there is no market or where the market is not truly determinative of value. In this case, there was a market for the Tripoli from which a fair market value could be derived, and a comparison-of-market approach was appropriate. There was no need to use other methods such as replacement cost or capitalization of income.

The Board contends that while no method of valuation of mineral interests is set forth in the statute, an example of the legislature's intent with respect to the valuation of mineral interests can be found in section 10—180 of the Code (35 ILCS 200/10—180 (West 1994)), which prescribes the method of valuation for coal. Pursuant to section 10—180, developed coal is assessed at 33¹/₃% of the developed coal reserve economic value, which is defined as the present value of the anticipated net income from the property during the life used to determine the developed coal. 35 ILCS 200/10—180 (West 1994). The Board maintains that the method of valuation is nothing more than a

method of determining the fair cash value of coal on mined land, that the clear intent of the legislature as determined by the plain language of section 10—180 is that the income-earning capacity of the coal should be taken into account when determining its value, and that the general legislative intent that can be gleaned from section 9—145(a) in light of section 10—180 is that minerals, oil, and gas are to be valued by income-earning capacity. The Board maintains that the method it used to value the Tripoli was analogous to that used to value coal deposits and took into account the Tripoli deposits' full income-earning capacity.

The fatal flaw in the Board's argument is that section 9—145(d) specifically exempts coal from the valuation method set forth therein. Section 9—145(d) provides: "Oil, gas[,] and other minerals, *except coal*, shall have value and be assessed separately at 33¹/₃% of the fair cash value of such oil, gas[,] and other minerals. Coal shall be assessed separately at 33¹/₃% of the coal reserve economic value, as provided in Sections 10—170 through 10—200." (Emphasis added.) 35 ILCS 200/ 9—145(d) (West 1994). It is evident that the legislature has chosen to value coal differently than other minerals. To adopt the Board's argument would be to nullify the last sentence of section 9—145(d).

The Board also maintains that the PTAB's use of the royalty fees as a basis for valuation was improper because Unimin owned both the surface rights and the mineral interest and that no leasehold or royalty was involved. The Board contends that the PTAB assessed, not the value of the Tripoli, but the value of the right to receive a royalty or leasehold estate. Unlike the propriety of the method of valuation used by the PTAB, this is a question of fact involving differences of opinion with respect to value. Manifest weight of the evidence is the appropriate standard.

While it is true that there was no leasehold involved because Unimin owned both the surface and mineral estates, the mineral estate had to be valued because the surface estate had been assessed separately. The PTAB determined that the royalty fee for the Birk pit was the best evidence of the market value of the Tripoli. Once minerals are severed from the soil in which they are embedded, they become personal property. *Palumbo v. Harry M. Quinn, Inc.*, 323 Ill. App. 404, 55 N.E.2d 825 (1944). The minerals must therefore be valued as they lie in the ground, prior to any removal. Cowley testified that the fair market value was 50 cents per usable ton. He further testified that for leased mineral rights Unimin usually pays 30 cents to 50 cents per usable ton. The most recent lease, executed in 1993, was for 50 cents per ton. Two other leases likewise provided for a payment of 50 cents per ton upon extraction. In other words, under these leases Unimin paid

50 cents per ton for unmined Tripoli. The PTAB could reasonably infer from this that Unimin could sell the unmined Tripoli for 50 cents per ton. It was therefore reasonable and not against the manifest weight of the evidence to base its assessment on this figure. The Board argues that, contrary to the PTAB's findings, the method of valuation used by Mayberry was not an improper attempt to value Unimin's business. As noted above, factual determinations by the PTAB are *prima facie* correct and will not be set aside on review unless contrary to the manifest weight of the evidence. Reviewing the record, we cannot say that the PTAB's finding is contrary to the manifest weight of the evidence.

Finally, the Board argues that the PTAB erred in determining that the Board had improperly included Tripoli mined from property other than the McCrite pit. Having determined that the PTAB's assessment was correct, we need not address this issue.

For the foregoing reasons, the judgment of the Property Tax Appeal Board is affirmed.

Affirmed.

GOLDENHERSH and MAAG, JJ., concur.