Docket No. 102318.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

THE KANKAKEE COUNTY BOARD OF REVIEW, Appellant, v. THE PROPERTY TAX APPEAL BOARD *et al*., Appellees.

*Opinion filed June 7, 2007.*

JUSTICE BURKE delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Freeman took no part in the decision.

## OPINION

Section 1–130 of the Property Tax Code (Code) defines taxable property as "[t]he land itself, with all things contained therein, and also all buildings, structures and improvements, and other permanent fixtures thereon, *** and all rights and privileges belonging or pertaining thereto, except where otherwise specified by this Code." 35 ILCS 200/1–130 (West 2004). In the instant case, petitioner Kankakee County board of review assessed the property of

respondent Natural Gas Pipeline Company of America (taxpayer[1]) for the tax years of 2000 and 2001. In its assessments, petitioner included the value of the rights and privileges taxpayer enjoys to two gas storage reservoirs that lie under the surface property of others. Taxpayer appealed these assessments before the Property Tax Appeal Board (PTAB) which found that the rights and privileges to the reservoirs should not have been assessed to taxpayer's property. The PTAB then reduced the property's assessed value for each year. The appellate court confirmed the decision of the PTAB.

We granted petitioner's petition for leave to appeal (210 Ill. 2d R. 315) and permitted the Central Illinois Public Service Company, Central Illinois Light Company, Centerpoint Energy-Mississippi River Transmission Corporation, Commonwealth Edison Company, Illinois Power Company, Invenergy Investment Company LLC, Magellan Pipeline Company, L.P., Northern Illinois Gas Company, d/b/a Nicor Gas, North Shore Gas Company, and the Peoples Gas Light and Coke Company to file a brief *amici curiae* in support of taxpayer. We have also permitted the Illinois Telecommunications Association to file a brief *amicus curiae* in support of all respondents. For the reasons that follow, we find that the rights and privileges to the reservoirs should not be included in the assessment of taxpayer's property, and affirm the judgment of the appellate court.


BACKGROUND

Taxpayer, a subsidiary of Kinder Morgan, a Kansas corporation, owns a 75.976-acre parcel of land in Kankakee County (hereinafter, the subject property) on which it operates a multibuilding control center. The control center, known as Compressor Station 201, facilitates the piping of gas to a cross-country pipeline 16 miles away and the storage of natural gas in two underground storage facilities. The underground storage facilities, known as "reservoirs," are actually two separate layers of porous rock lying 1,700 and 2,400 feet below

---

[1]This term includes both the current owner, Natural Gas Pipeline Company of America, and its predecessor, Natural Gas Storage Company of Illinois, a Delaware corporation.

the surface, respectively. These reservoirs[2] lie below approximately 15,600 surface acres that surround and include the subject property. Taxpayer owns the portion of the reservoirs that lies directly below the subject property, but does not own any of the surrounding 15,600 acres or the reservoirs that lie below them.

For storage purposes, natural gas is injected into the reservoirs through a system of pipes that connect the pipeline to the compressor station, and connect the compressor station with 281 wells that reach down into the reservoirs at various surface points throughout the 15,600 acres. The injected gas displaces the water that naturally occurs within the porous rock. The displaced water then creates a natural "vessel" which keeps the gas from escaping laterally. The gas is prevented from exiting to the surface by a layer of nonporous rock that is likened to an upside-down soup bowl. The injection process is reversed when gas is removed from the reservoirs. Taxpayer charges its customers monthly reservation charges and tariffs based on gas volume transported.

In the early 1950s, before it acquired the subject property or began construction of the compressor station, taxpayer secured voluntary easements from the owners of the land that lay above and included the reservoirs so that it could install and operate the wells and pipes used in its storage system. The easements taxpayer acquired are similar for each granting owner. An easement identified as "the Dickman easement," which was found to be representative by the PTAB, reads in pertinent part: "This instrument made this [date] by record owner [name of the fee landowner], herein referred to as Grantors, is in favor of Natural Gas Storage Company of Illinois, a Delaware corporation, herein referred to as Grantee." The easements give taxpayer, as grantee, "the exclusive right, privilege and easement to introduce natural gas or other gases or vapors *** into the [reservoirs] *** to store gas in said storage reservoir and retain the possession of gas so stored as personal property, [and] to remove gas *** from the storage reservoir."

---

[2]The reservoirs are part of a much larger underground geological formation known as an aquifer. Any testimonial references to "the aquifer" can be inferred to be references to the reservoirs at issue.

The easements also give taxpayer the right to drill wells, construct and maintain those wells, lay pipes and electric lines on the grantees' properties, and to enter onto the grantees' properties to maintain the wells and pipes. In return, taxpayer pays each landowner an annual monetary sum. Taxpayer also agrees to pay the landowners for any damage to crops, timber, or fences that its activities may cause, and to provide grantees with free city water.

In 1952, orders from the Illinois Commerce Commission (ICC) and Federal Power Commission (FPC) gave taxpayer the exclusive right to store gas in the reservoirs, to construct Compressor Station 201, to run approximately 16 miles of pipe from Compressor Station 201 to the cross-country pipeline, to dig the wells down to the reservoirs, and to lay the pipe that connects the wells with Compressor Station 201.[3] Once the FPC and ICC orders were in place, taxpayer purchased the subject property from Otto Kruse and constructed Compressor Station 201. Operations began thereafter and continue to this day.

Petitioner assessed the subject property based on market values of $17,160,849 for the tax year of 2000, and $32,000,000 for the tax year of 2001. Market value is defined by the Uniform Standards of Professional Appraisal Practice as "the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."

Taxpayer paid the taxes in full for each year, and then appealed both the 2000 and 2001 assessments to the PTAB. These appeals were consolidated. Before the PTAB, taxpayer submitted several other appraisals of the subject property, all of which estimated its market value at between $1,625,000 and $1,700,000. Kankakee County officials, employees of taxpayer, and the drafters of all the

---

[3]As the 1950s progressed, the FPC and ICC issued additional orders allowing alterations and expansions to the original control center. In 1958, taxpayer sought to expand its use of the aquifer to an even deeper layer of porous rock, and filed supplemental applications with the ICC and FPC, which were approved.

appraisals appeared and testified at two hearings before the PTAB in April 2002 and May 2003.

At the 2002 hearing, Brad Baker, the assessor for the subject property's township, testified that he assessed the subject property for the 2000 tax year based on a market value of $17,000,000. He testified that this market value "was on the books, and it was just a value that's been carried on throughout the years." Baker stated that he did not know how any of the previous assessment values, or the "cost ladders" detailing appreciation, were calculated.

Sheila Donohoe, the chief county assessment officer for Kankakee County, also testified. Donohoe testified that she had no record of any complete appraisal of the subject property prior to the year 1999, although adjustments to the valuation of the subject property had been made throughout the years to account for the addition of new buildings and structures. Donohoe stated that the county's assessment records for the subject property make no reference to the reservoirs, nor attribute a value to them. Donahoe also testified that the county does not assess pipelines.

Steven Beatty, a member of the board of review, testified that petitioner endorsed the $17,000,000 market value provided by Baker for 2000 based on "testimony and research that was done and review of information that was available at the hearings that we had, as well as research that we did elsewhere." Beatty also testified that petitioner based its 2001 assessment on an appraisal of the subject property's market value prepared by Gary DeClark and Nancy Myers of Integra Realty Resources of Chicago (Integra).

Integra's appraisal was entitled "A Converted Aquifer Natural Gas Storage Facility of 101.4 BCF Capacity Beneath 75.976 Fee Owned Acres at 5611 S. West Road And Inclusive of Subterranean Easement Rights Beneath Some 15,600 Acres of Unowned Land." The "Special Limiting Conditions" section of the appraisal stated,

> "[T]he subject's storage field actually lies below the surface of some 15,600 acres of land; meanwhile, that land area under fee ownership, according to available public records, is 75.976 acres, a mere fraction of the total surface area over the storage field. Therefore, this analysis assumes that the rights to be considered include the subterranean easement rights for access

to and utilization of the storage field across the remaining 15,600 $\pm$ acres of land not owned in fee title by subject property ownership."

The assumption that the subject property is the beneficiary of easement rights to the reservoirs was repeated and relied upon several times throughout Integra's appraisal. On cross-examination, DeClark admitted that he did not read the gas storage easements before he prepared his appraisal. He also admitted that, upon inspection, the easements name taxpayer as the grantee, and not the subject property, or any specific piece of property. When asked to indicate on a map exactly where the parcels burdened by easements were, DeClark was unable to do so. DeClark also admitted that portions of the reservoirs extend into Iroquois County, and that his appraisal did not take that fact into account.

DeClark testified that he believed taxpayer's easements, along with the permits and certifications from the ICC and FPC, created a "bundle of rights" that met the "unit rule" test of common ownership, which is why he included them in the valuation. DeClark defined the unit rule as "a rule in real estate valuation that requires the value of the property in its entirety or its whole to be valued as an entity, rather than the summation of the various parts to which it may have been divided." The unit rule should be applied, DeClark stated, if a common use, common ownership, and contiguity are all present in the property being appraised. DeClark explained that, in applying the unit rule to the subject property, he looked at the relationship between the reservoirs and the subject property and found a common use and contiguity because "the entire entity of [taxpayer's] facility, which incorporates the buildings, the 75 acres and the subterranean easement rights to use the aquifer for gas storage is the use." DeClark stated that the "common ownership" requirement of the unit rule was met because taxpayer "owns the land in fee and also owns the buildings thereon, but it also has a portion of the bundle of rights that ascribe to it from the use of the [reservoirs.]" On cross-examination, DeClark admitted that he did not mention the unit rule in his appraisal but considered it "implicit in the valuation analysis that [he] conducted."

DeClark's appraisal valued the subject property under three different methods: the cost approach, the income approach, and the

-6-

property tax valuation method. Under the cost approach, the appraisal valued the replacement cost of the reservoirs, main buildings, ancillary buildings, wellheads, tanks, fencing, and dikes, then detailed their values given minus the appropriate depreciation and obsolescence costs, and arrived at a cost approach market value of $30,000,000.

For the income approach, DeClark's appraisal used a discounted cash flow analysis. DeClark stated that such an analysis "take[s] a look at *** the anticipation of future benefits to get a present value calculation or value conclusion." In applying this analysis, the appraisal noted that "the subject is a special use facility with an income stream tied directly to the capacity of an underground storage 'vessel.' " On cross-examination, DeClark admitted that he was unable to acquire income data specific to the subject property, but that he calculated a proportionate share of taxpayer's total storage income and assumed it to be applicable to the storage facility in question. The appraisal did this by considering the storage facility's "capacity, location, and customer base as compared to [taxpayer's] total gas storage capacity and the locations of its other storage fields." After arriving at a net operating income, DeClark's appraisal applied a royalty percentage to the income stream based on his research of landfills, which he deemed "similar in that they are land based as is this underground storage vessel." The appraisal then estimated market value for the income approach at $32,590,000.

On cross-examination, DeClark stated that, for the property tax methodology, he used a system based on how taxation of depleted gas fields occurs in Ohio. The Ohio method calls for the property owner to pay a tax predicated upon the plant, buildings, and wells, as well as the volume of gas in the reservoir. These values are then depreciated accordingly to arrive at an assessed value. In applying this system to the subject property, DeClark arrived at a value of $35,880,000. As to the Ohio method, DeClark admitted on cross-examination that he was not sure if depleted gas fields in Ohio were assessed and taxed as real estate or personal property. DeClark also testified that he was aware that the "property tax approach" is not currently applicable in Illinois. According to DeClark, he implemented it in his appraisal as a "check of reasonableness."

The Integra appraisal then reconciled the values from the cost approach, the income approach, and the property tax methodology, and arrived at a market value of $32,000,000.

In support of their appeal before the PTAB, respondent taxpayer presented several appraisals of the subject property, all of which estimated its market value at between $1,625,000 and $1,700,000. Two of these appraisals were created by Howard B. Richter & Associates, Inc., of Deerfield. The valuation dates for the Richter appraisals were January 1, 2000, and January 1, 2001. The Richter appraisals identified the subject property as "Natural Gas Pipeline Company of America, Storage Facility." Richter's appraisals detailed the characteristics of the subject property and all of its buildings, and mentioned that the underground storage facility is "controlled through easements with the neighboring farm owners" but did not attribute those easements to the value of the property.

Richter's appraisals applied only the cost approach, and arrived at an estimated value of $1,665,000 for 2001 and $1,625,000 for 2000. A passage in one appraisal explained Richter's reasoning for not using the income approach. It stated, "No rental attributable to the real estate alone can be ascertained and the basis of this approach is negated." When cross-examined about this statement, Richter replied, "Any income generated by the ability to tap into this aquifer is attributable to the business and exists only because of the off-site business operations of this company"; and "[t]he market value of the real estate in this case has virtually no relationship to the income generated as a result of this property's *** operations." Richter then likened the storage of gas to the storage of files in a warehouse. In each business, he explained, the customer does not care where their files or gas are stored, but only that the files or gas are transported away from the business, stored safely, and returned or delivered when the need arises. According to Richter, the location of the storage facility is immaterial in each case and, therefore, the property itself cannot be said to have contributed in any way to the income of the business.

Respondent taxpayer also submitted appraisals done by Robert Herman and Michael Kelly of Real Estate Analysis Corporation. Herman's appraisals were dated January 1, 1999, and January 1, 2000.

Kelly's appraisal was dated January 1, 2001. Each document appraised only the subject property and its improvements. Herman and Kelly testified that, for their appraisals, they used only the cost approach and the sales comparison approach. Kelly stated that he did not utilize the income approach because taxpayer could conduct its operations away from the subject property, including in Iroquois County. Herman stated that he did not include the value of the easements because they related to the going concern of the business, and not to the subject property. Each appraiser testified that they were aware that the entire facility was constructed to utilize the reservoirs, and that easements and government permits were essential to the creation of the facility. However, in their opinion, neither of these factors added any value to the subject property. Both appraisers noted that an analysis of the assessments of other parcels which sit atop the reservoirs showed no added value as a result of their location. Herman's appraisal estimated the value of the subject property at $1,650,000 for each year, and Kelly's appraisal arrived at a figure of $1,700,000.

Floyd Hofstetter, the vice president of storage management for taxpayer, then testified in depth about the history and current operations of the compressor station and its connection to the pipeline 16 miles away. His testimony touched on such details as the monitoring of the facility, managing the containment of the stored gas, the make-up and installation of the well network, the geological characteristics of the aquifer, the deliverability rate of the two reservoirs, the cost estimates that should be accounted for in the development of a gas storage field, and descriptions of the compressor, gas processing equipment, and piping. Hofstetter confirmed that Taxpayer had to obtain a certificate of convenience from the Federal Energy Regulatory Commission (FERC) (the successor to FPC) to operate the facility and that the rates taxpayer charges for storage are regulated by FERC.

Over petitioner's objection, Patrick McFadden, a professor from Loyola University-Chicago School of Law, testified about the difference between easements appurtenant and easements in gross. According to McFadden, easements appurtenant benefit a designated property and "run with the land." Conversely, easements in gross

accrue not to property, but to an individual or entity. McFadden testified that he had examined the Dickman easement, and determined it to be an easement in gross which benefitted taxpayer.

During the hearing, petitioner attempted to have the PTAB compel the testimony of Donald Puckett. Petitioner referred to Puckett as taxpayer's district manager, but in actuality Puckett is the operations manager of the plant on the subject property. Petitioner felt that Puckett's testimony was necessary because he was the "tour guide" and source of some information for DeClark when DeClark visited the facility during the course of his assessment. Petitioner's motion requesting that the PTAB subpoena Puckett was denied.

At the conclusion of the hearings, the PTAB found that petitioner erred in relying on the DeClark appraisal for its valuation of the subject property. In its decision, the PTAB noted that petitioner failed to provide any evidence that Illinois law authorizes application of the "unit rule" to the subject property, or that it was appropriate to include the reservoirs in the valuation of the subject property. The PTAB noted that its decision was based on the fact that portions of the reservoirs were in Iroquois County, that the subject easements did not run with the subject property, that petitioner failed to establish any sort of legal "nexus" between the government permits and the subject property, and that DeClark's appraisal contained several errors. The PTAB also held that petitioner failed to adequately describe the reservoirs it wished to be included in the valuation of the subject property. The PTAB found that no weight could be given to DeClark's appraisal and instead deemed Kelly's appraisal to be the most appropriate. The PTAB concluded that the market value of the subject property was $1,700,000.

With one justice dissenting, the appellate court confirmed the decision of the PTAB. The appellate court held that petitioner failed to adequately describe the reservoirs it proposed to include in its valuation, and failed to provide any authority to support its contentions that the easements and government permits that accrued to Taxpayer benefitted the subject property. No. 3–04–0016 (unpublished order under Supreme Court Rule 23). This appeal followed.

-10-

ANALYSIS

Before this court, petitioner characterizes the main issue of this case as the proper interpretation of section 1–130 of the Code, which holds that taxable real estate includes "all rights and privileges belonging or pertaining thereto." 35 ILCS 200/1–130 (West 2004). As this is an issue of statutory interpretation, petitioner contends *de novo* review is proper. Petitioner also contends that the appropriate property tax assessment methodology is at issue as well, and that this too should be reviewed *de novo*.

Respondents argue that this case involves a mixed question of law and fact. Respondents admit that the PTAB was required not only to construe the meaning of section 1–130 of the Code, which is a question of law to be reviewed *de novo*. However, respondents claim that the PTAB also had to make factual findings as to whether there was some basis for each appraiser's valuations. Respondents then contend that the PTAB had to apply these facts to determine whether the right to store gas in the reservoirs was a right attributable to the subject property. According to respondents, this law-to-fact application should be reviewed under the clearly erroneous standard.

We initially note that we are not charged with the responsibility of determining the market value of the subject property. Rather, the central question before us is whether the PTAB's decision to reduce petitioner's tax assessments for the 2000 and 2001 tax years was correct. The determination turns on whether petitioner employed a proper valuation method in assessing the subject property. More particularly, it turns on whether the easements, governmental permits, and rights to utilize the reservoirs for gas storage should be considered "rights and privileges belonging or pertaining to" the subject property. Accordingly, our first determination is one of statutory construction, which is reviewed *de novo*. *Fisher v. Waldrop*, 221 Ill. 2d 102, 112 (2006). Following that, we must determine whether the PTAB considered appraisals that utilized the proper methodology for the valuation of the subject property. This, too, is a legal question to be reviewed *de novo*. *Kankakee County Board of Review v. Property Tax Appeal Board*, 131 Ill. 2d 1, 14 (1989). See also *United Airlines, Inc. v. Pappas*, 348 Ill. App. 3d 563, 569 (2004) ("This appeal requires us to examine the appropriateness of the

valuation methodology used by taxpayer's expert in valuing the leasehold interest to support its objection to the leasehold's assessed value. *** Therefore, our standard of review relating to the question of law at issue in this appeal is *de novo*)"; *Board of Review v. Property Tax Appeal Board*, 304 Ill. App. 3d 535, 538 (1999) ("Where the propriety of the method of valuation is challenged *** the issue is one of law").

## I. "Belonging or Pertaining"

Section 1–130 of the Code defines taxable property as "[t]he land itself, with all things contained therein, and also all buildings, structures and improvements, and other permanent fixtures thereon, *** and all rights and privileges belonging or pertaining thereto, except where otherwise specified by this Code." 35 ILCS 200/1–130 (West 2004). Petitioner contends that, by choosing to include the words "belonging or pertaining" in the definition, the General Assembly intended another property right short of fee simple ownership.

In construing a statute, we must give effect to the intention of the legislature "so that each word, clause, or sentence is given reasonable meaning and not deemed superfluous or void." *Quad Cities Open, Inc. v. City of Silvis*, 208 Ill. 2d 498, 508 (2004). A tax statute must be strictly construed against the government and in favor of the taxpayer. *Van's Material Co. v. Department of Revenue*, 131 Ill. 2d 196, 202 (1989); *Gem Electronics of Monmouth, Inc. v. Department of Revenue*, 183 Ill. 2d 470, 475 (1998).

" 'The primary meaning, and also the common and ordinary meaning, of the word "belong," is to be the property of.' " *In re Estate of Ostrowski*, 3 Ill. App. 2d 431, 435 (1954). See also Black's Law Dictionary 164 (8th ed. 2004) (defining "belong" as "[t]o be the property of a person or thing"). Petitioner maintains that, if "belonging" connotes ownership of rights or privileges, the disjunctive reference to "pertaining" in section 1–130 of the Code must indicate something different and broader than mere ownership of said rights and privileges. "Pertain" is defined as "[t]o relate to; to concern." Black's Law Dictionary 1181 (8th ed. 2004).

There is no dispute by either party that the reservoirs at issue belong, proportionately, to those who own the surface land directly above them. See *Jilek v. Chicago, Wilmington & Franklin Coal Co.*, 382 Ill. 241, 248 (1943) ("The owner in fee owns to the center of the earth"). Petitioner argues, however, that the easements and governmental permits that allow taxpayer to utilize the portions of the reservoirs not under the subject property make up a "bundle of rights" that "pertains" to the subject property, thus enhancing its value beyond that of the neighboring industrial or farming property.

According to respondents, all of petitioners' arguments contain the same fundamental flaw: incorrectly assuming that the gas storage rights that taxpayer obtained and exercised benefitted the subject property, and not taxpayer's business. We agree with respondents and find that, while "pertain," for purposes of section 1–130 of the Code, might imply a less rigid connection than "belong," there still must be some direct relationship between the rights and the property at issue. For the following reasons, we find that petitioner has not established such a relationship.

A. Easements

The first components of the "bundle of rights" which petitioner contends pertain to the subject property are the easements that allow taxpayer to operate its pipes and wells on the 15,600 acres of property owned by others that surrounds Compressor Station 201. Petitioner concedes that these easements are easements in gross that name taxpayer, and not the subject property, as their beneficiary, but maintains that the classification of the easements is irrelevant because the easements "provide only part of the basis for Taxpayer's exclusive storage rights." Petitioner argues that, because the easements are only part of the "bundle of rights," their classification is not determinative. Further, according to petitioner, there is no legal authority to support the contention that easements in gross may not be considered as "rights and privileges" of a particular property.

An easement appurtenant is "created to benefit another tract of land, the use of easement being incident to the ownership of that other tract." Black's Law Dictionary 549 (8th ed. 2004). An easement appurtenant runs with the land and may be transferred. *Traylor v.*

-13-

*Parkinson*, 355 Ill. 476, 479 (1934). An easement in gross is defined as "[a]n easement benefiting a particular person and not a particular piece of land." Black's Law Dictionary 549 (8th ed. 2004). See also *Traylor*, 355 Ill. at 479 (easement in gross is personal and nontransferable).

The Dickman easement, found to be representative, reads, "This instrument made this [date] by record owner [name of the fee landowner], herein referred to as Grantors, is in favor of Natural Gas Storage Company of Illinois, a Delaware corporation, herein referred to as Grantee." Such wording clearly indicates that these easements are in gross, and benefit taxpayer rather than the subject property, as petitioner concedes.

We find, contrary to petitioner's unsupported argument, that the classification of the easements in question is relevant here. Were the easements at issue here appurtenant, naming the subject property as the beneficiary of the right to place wells and pipes on the land of others, then such right would be attributed to the subject property and assessable by petitioner. The easements in question, however, are easements in gross, benefitting taxpayer, and not the subject property. Petitioner's contention that the legal effect of the easements is somehow negated by the fact that they are part of a "bundle of rights" has no support in logic or the law. Accordingly, we find that the easements in question do not pertain to the subject property.

## B. ICC and FPC Permits

Petitioner next argues that certain passages in the orders of the ICC and FPC, as well as taxpayer's correspondence with those agencies, serve as evidence that the rights and privileges to the reservoirs that accrued to the taxpayer pertain to the subject property. Petitioner initially notes that the September 1952 order of the FPC, which granted taxpayer the right to construct Compressor Station 201 and utilize the reservoirs, includes the words "storage rights in approximately 15,000 acres *** together with all necessary and appropriate consents, permits, contracts, easements, rights-of-way, and other interests in property pertaining to or used in connection with the storage project." Petitioner notes that the FPC used the term "pertaining," which is the statutory term at issue here. Petitioner

-14-

argues that the PTAB incorrectly concluded that the method of assessing the subject property may not take account of these "pertaining" underground storage rights.

Petitioner also details the history of the creation of Compressor Station 201 and the use of the reservoirs, concluding that the history of regulatory approvals leading to the development of the gas storage project shows that the reservoirs were "intended to be operated as a single facility which would necessarily be managed and controlled" from one control center, wherever constructed. In support of its contention, petitioner cites two 1952 orders from the ICC and FPC, each granting taxpayer the right to "acquire ownership in fee simple or by other estate of parcels of real estate within or adjacent to the storage area necessary for the erection of compression plants, dehydration plants, and any structures appurtenant thereto, [and] lay gathering lines to connect them to the centrally located compressor station and dehydration plant." Petitioner also relies on a 1959 supplemental order from the ICC as well as a 1959 legal notice that ran in the Kankakee Daily Journal. These provide that taxpayer "owns and operates (under authority of certificates of public convenience and necessity issued to it by the FPC) an aquifer-type underground storage reservoir near Herscher."

Petitioner asserts that these passages from the recorded history of regulatory approval leading up to the development of the gas storage operation show plainly that the reservoirs were intended to be operated in union with a compressor station located in their vicinity. Petitioner contends that, since Compressor Station 201 is located on the subject property, the subject property cannot then be separated from the reservoirs for valuation purposes.

Illinois case law is consistent in holding that government permits, ordinances, licenses, orders, or regulatory approvals do not create assessable entities. See, *e.g.*, *Boland v. Walters*, 346 Ill. 184, 188 (1931) (a license in respect to real property is merely a privilege to do certain things on land without being an estate itself); *Dimucci Home Builders, Inc. v. Metropolitan Life Insurance Co.*, 312 Ill. App. 3d 779, 782 (2000) (permits are not conveyances of title); *Pasquinelli v. Village of Mundelein*, 257 Ill. App. 3d 1057, 1062-63, 1065 (1994)

-15-

(permits and village board approvals to operate a sewer line are not indicia of ownership).

*Central Illinois Public Service Co. v. Swartz*, 284 Ill. 108 (1918), is instructive. In *Swartz*, the plaintiff was granted, by ordinance, the right to construct and maintain an electric plant as well as electric poles and wires in the town of Bushnell. *Swartz*, 284 Ill. at 110. When the property of the plaintiff was assessed for taxation, the assessor included the "franchise, got through an ordinance of the city of Bushnell, to operate a plant in the city." *Swartz*, 284 Ill. at 110. The *Swartz* court rejected the assessment of the franchise as tangible property. *Swartz*, 284 Ill. at 112. Specifically, it stated,

> "This permission or license exists independently of the poles, wire, apparatus, machinery or other means whereby it may be available. It attaches not to the tangible property of the corporation but to the franchise, and would remain and be available to the corporation if all its tangible property were destroyed." *Swartz*, 284 Ill. at 112.

In the instant case, all of the ICC and FPC orders attached to taxpayer, and not to the subject property. Just as in *Swartz*, should the taxpayer choose to leave the subject property, or suffer any destruction of its tangible property, the orders would remain in place, continuing to benefit taxpayer regardless of where its property was located. See also *Quantum Pipeline Co. v. Illinois Commerce Comm'n*, 304 Ill. App. 3d 310, 315-17 (1999) (permit issued by the ICC grants only a business right, not one of property). Accordingly, we find that the ICC and FPC orders did not, as petitioner alleges, create an indivisible union between the subject property and the reservoirs. Rather, the rights to the reservoirs accrue to taxpayer, and do not pertain to the subject property.

We note that petitioner attempts to draw an analogy between governmental orders such as those at issue in the instant case and property zoning. Petitioner argues that, just as zoning changes can affect the use of property and therefore its value, the rights to use the reservoir, which arise from easements and governmental rulings which have transpired over 50 years, enhance the value of the subject property. We find no merit in this argument.

-16-

Zoning regulations apply to particular properties and not their owners. See *Lake Forest Chateau, Inc. v. City of Lake Forest*, 133 Ill. 2d 129, 131 (1989) (zoning ordinances apply to property). As noted, the government orders at issue here accrue to taxpayer and not the subject property. Accordingly, petitioner's analogy to zoning is unpersuasive.

In light of our holdings above regarding easements and government permits, we find that the rights and privileges taxpayer enjoys to the reservoirs neither belong nor pertain to the subject property for purposes of section 1–130 of the Code.

## II. Location

Petitioner next contends that regardless of whether the "rights and privileges" to the reservoirs are tied to it through any recorded basis or legal title, the subject parcel's proximity to the reservoirs enhances its value. Petitioner argues that Illinois courts routinely acknowledge that property value may increase or decrease due to elements that lay beyond the boundaries of the property. In support of its argument petitioner points to cases such as *Lake County Board of Review v. Property Tax Appeal Board*, 91 Ill. App. 3d 117, 122 (1980) ("property adjoining or in close proximity to a body of water, a park, golf course or other scenic view may well have an increased value because of its location"), *O'Brien v. City of O'Fallon*, 80 Ill. App. 3d 841 (1980) (value of house on lake impaired when sewage discharged into lake), and *Illinois Light & Power Co. v. Bedard*, 343 Ill. 618 (1931) (it is common knowledge that land located near a body of water is worth more than land located elsewhere).

Petitioner then cites *Board of Education of Township High School District 205 v. Property Tax Appeal Board*, 142 Ill. App. 3d 853 (1986), as an example of how location alone can enhance a property's value. In *Board of Education*, the property to be valued was a hydroelectric power plant. *Board of Education*, 142 Ill. App. 3d at 854-55. The *Board of Education* court held that the PTAB properly valued the plant by using the income approach applied to the power-generating capacity and potential income of the plant. *Board of Education*, 142 Ill. App. 3d at 857. Petitioner asserts that in both *Board of Education* and the instant case, the property at issue houses

a "control center" type facility that utilizes a resource not found within the boundaries of that property. Petitioner maintains that the hydroelectric power plant in *Board of Education,* which takes its power from the river that begins and ends outside the boundaries of the property, is directly analogous to Compressor Station 201 here, which is used to access the natural gas stored in the reservoirs that lay mostly outside the subject property.

We do not dispute petitioner's argument that amenities or resources situated beyond a property's boundaries can increase its value. The difference between the properties in the cases petitioner relies on and the subject property, however, is one of market value. There is and will always be a market for properties with access to water, golf courses, and countless other features that hold value to prospective purchasers. There is no similar market for the subject property. Any purchaser who might acquire the subject property would not be able to utilize the reservoirs. This is because taxpayer, and not the subject property, holds exclusive rights, obtained through easements and government orders, to use the reservoirs. Thus, the right and privilege of being close to the reservoirs is not a marketable asset, and the market value of the subject property is not enhanced beyond that of other industrial or farming properties in the area.

Moreover, *Board of Education* does not support petitioner's contention. In *Board of Education*, the income approach to valuation was proper because the plant generated income due solely to its proximity to the river. The ability of a hydroelectric plant to generate income is directly tied to its location. A plant in a location away from the river would not be able to generate the same income. In the instant case, there is no similar need for the compressor station to be located on the subject property. Testimony has established that the compressor station could have been located anywhere in the area, even 16 miles away from the reservoirs along the main pipeline. In contrast to the hydroelectric plant, which derived its entire income value from its location on a river, the location of the compressor station, whether above the reservoirs or otherwise, has no real impact on the income it produces. Therefore, we find *Board of Education* to be inapplicable to the instant case.

Petitioner makes the argument that changes to the control center are forbidden without approval from FERC and the ICC, and that moving a gas storage control center with all its related equipment and connecting entities cannot be readily accomplished. This argument is misplaced. The issue is not whether Compressor Station 201 can be moved, but rather whether its income is derived from its location. Petitioner next contends that even if the compressor station were moved, the taxable character of the rights and privileges related to the reservoirs would not change, but would move with the compressor station. But this argument actually supports respondents' contention that the rights and privileges to the reservoirs do not pertain to the subject property. Accordingly, we find that the PTAB did not err when it relied on market value appraisals which did not attribute added value to the subject property due to its proximity to the reservoirs.

### III. "A Broad Concept of Rights and Privileges"

Petitioner relies on *People ex rel. City of Chicago v. Upham*, 221 Ill. 555 (1906), as an example of this court interpreting the statutory definition of real property now found in section 1–130 of the Code and applying a "broad concept of rights and privileges." Petitioner contends that *Upham* provides sufficient authority to consider the rights and privileges of the reservoirs in the assessment of the subject property.

In *Upham*, the respondent telephone and telegraph companies, by virtue of city ordinances, constructed cement tunnels beneath Chicago city streets to facilitate their businesses. *Upham*, 221 Ill. at 558. The ordinances authorized the corporations to maintain the tunnels for 30 years, at which time the tunnels could become the property of the city. *Upham*, 221 Ill. at 558. The petitioner contended that the tunnels were taxable assets that it should assess. *Upham*, 221 Ill. at 559. The respondent conceded that the tunnels were subject to assessment for taxation, but contended that since they were constructed below public streets, the taxable interest was one of intangible use, and not one of real property to be assessed by local assessors. *Upham*, 221 Ill. at 559.

-19-

The *Upham* court found that "while it is true the title to the streets of Chicago is in the city, the [corporations], by virtue of said ordinances, clearly have 'rights and privileges' belonging and pertaining to the soil in which the tunnels are constructed, separate and apart from the fee of the streets, which rests in the city." *Upham*, 221 Ill. at 560. The *Upham* court held that the tunnels had an existence separate from the city streets above and were real property in the same way that a bridge or a pier has a separate existence from the land upon which it is constructed. *Upham*, 221 Ill. at 560. The fact that the tunnels were situated below city streets not subject to assessment for taxation had no bearing on this court's determination that the tunnels were real property. *Upham*, 221 Ill. at 561. See also *People ex rel. New York & Harlem R.R. Co. v. Commissioners of Taxes & Assessments*, 101 N.Y. 322, 326, 4 N.E. 127, 128 (1886) (tunnels under city streets should be treated and assessed as real property).

We find *Upham* distinguishable and insufficient authority to support a finding that the rights and privileges taxpayer enjoys to the reservoirs are assessable to the subject property. The issue in *Upham* was whether the underground tunnels were real property or an intangible right. *Upham*, 221 Ill. at 560. There is no disagreement in the instant case as to whether the reservoirs are real property or whether they have an existence separate from the land under which they lay. The issue here is whether respondents' rights to utilize the reservoirs pertain to and should be assessed to the subject property. *Upham* provides no guidance on this issue.

Further, there is a fundamental difference between the man-made tunnels in *Upham* and the naturally occurring reservoirs in the instant case. Piers, bridges, and underground tunnels "create" new property where none existed before, in spaces that were heretofore nonassessable. Piers extend into water, bridges soar into air, and tunnels create space below the surface of land. *Upham* holds that such man-made creations have a "separate existence from the land in which they are constructed," and are assessable real property belonging to their constructors. *Upham*, 221 Ill. at 560. This differs greatly from the reservoirs at issue here, which are natural formations already owned by those who own the surface land above them. As such, we

find that *Upham* has no bearing on the issues of the instant case and does not support petitioner's argument that taxpayer's right to utilize the reservoirs should be assessed to the subject property.

## IV. Evidentiary Errors

Petitioner lastly argues that the PTAB committed evidentiary errors requiring reversal when it refused to require the appearance of Puckett at a hearing and allowed McFadden to testify about the difference between easements appurtenant and easements in gross. Petitioner argues that Puckett's testimony was essential because Puckett was DeClark's "primary tour guide" and that some of the information relied upon by DeClark in performing his analysis was provided by Puckett. In regard to McFadden, petitioner contends that his testimony amounted to legal conclusions, which are not properly admitted.

"Absent some indication that a restriction on evidence has a prejudicial impact upon an administrative proceeding, any error in that regard does not rise to the level of reversible error." *Kankakee County Board of Review v. Property Tax Appeal Board*, 337 Ill. App. 3d 1070, 1076 (2003). After carefully reviewing the record, we agree with the PTAB and the appellate court that petitioner has not demonstrated how it was prejudiced by Puckett's absence. The testimony of Floyd Hofstetter provided ample information about the operation of the compressor station and the utilization of the reservoirs. As to McFadden's testimony, which was about the differences between easements appurtenant and easements in gross, we note that petitioner concedes that the easements here are in gross. Accordingly, after reviewing the record, we do not find his appearance at the hearing constitutes reversible error.

## CONCLUSION

In light of our holdings above, we find that the decision of the PTAB to disregard Integra's appraisal, which attributed the rights and privileges of the reservoirs to the subject property, was correct. We need not address petitioner's contention that the PTAB erred in finding that petitioner failed to adequately describe the reservoirs it

-21-

wished to be included in the valuation of the subject property. We find that, because neither the reservoirs, nor the rights to utilize them, can be attributed to the subject property, their description is irrelevant. For the foregoing reasons, the judgment of the appellate court is affirmed.

*Appellate court judgment affirmed.*

JUSTICE FREEMAN took no part in the consideration or decision of this case.