2020 IL App (3d) 180384

Opinion filed August 17, 2020
Modified Upon Denial of Rehearing September 22, 2020

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| MANTENO COMMUNITY UNIT SCHOOL DISTRICT NO. 5, | ) ) ) | Appeal from the Illinois Property Tax Appeal Board |
| Petitioner, | ) ) | |
| v. | ) ) ) | Appeal No. 3-18-0384 Illinois Property Tax Appeal Board No. 13-00178.001-C-3 |
| THE ILLINOIS PROPERTY TAX APPEAL BOARD; DSI MANTENO OWNER, LLC; and THE KANKAKEE COUNTY BOARD OF REVIEW, | ) ) ) ) ) | Honorable Edwin E. Boggess, Administrative Law Judge, Presiding. |
| Respondents. | ) | |

JUSTICE WRIGHT delivered the judgment of the court, with opinion.
Presiding Justice Lytton and Justice Carter concurred in the judgment and opinion.

_____

**OPINION**

¶ 1        DSI Manteno Owner, LLC (DSI), appealed the Kankakee County Board of Review's

(Local Board) 2013 property tax assessment of its supportive living facility, Heritage Woods of

Manteno (Heritage Woods), to the Illinois Property Tax Appeal Board (PTAB). Manteno

Community Unit School District No. 5 (School District) intervened in the PTAB proceedings.

After a hearing, the PTAB reduced Heritage Woods's 2013 property tax assessment. The School

District seeks our direct review.

## I. BACKGROUND

Respondent, DSI, owns Heritage Woods, a certified supportive living facility in Manteno, Illinois, that houses Medicaid-eligible and private-pay residents. Under the Illinois Public Aid Code, 305 ILCS 5/5-5.01a (West 2012), a supportive living facility is a "free-standing facility or a distinct physical and operational entity within a nursing facility." Such facilities "integrate[ ] housing with health, personal care, and supportive services and is a designated setting that offers residents their own separate, private, and distinct living units." *Id.* The Illinois Administrative Code (Administrative Code), 89 Ill. Adm. Code 146.200(b) (2006), defines a supportive living facility as:

> "a residential setting in Illinois that provides or coordinates flexible personal care services, 24 hour supervision and assistance (scheduled and unscheduled), activities, and health related services with a service program and physical environment designed to minimize the need for residents to move within or from the setting to accommodate changing needs and preferences; has an organizational mission, service programs and a physical environment designed to maximize residents' dignity, autonomy, privacy and independence; and encourages family and community involvement."

The Illinois Department of Healthcare and Family Services (Department) established and now oversees the "program of supportive living facilities." 305 ILCS 5/5-5.01a (West 2012).

Heritage Woods is situated on 3.49 acres of land and has 37 studio, 44 one-bedroom, and 6 two-bedroom apartments, each of which has a private bathroom, kitchenette, and separate heating and cooling unit. Residents of Heritage Woods receive housekeeping, 24-hour access to

staff, and laundry machines free of charge. Common areas at Heritage Woods include a reception lobby, game room, salon, media room, library, and fitness center.

¶ 5        Pertinently, under section 1-55 of the Property Tax Code (35 ILCS 200/1-55 (West 2012)), Heritage Woods's property taxes were based on: "One-third of the fair cash value of property, as determined by the Department[ of Revenue]'s sales ratio studies for the 3 most recent years preceding the assessment year, adjusted to take into account any changes in assessment levels implemented since the data for the studies were collected." Respondent, the Local Board, used a fair cash value of $5,098,656 to assess Heritage Woods's 2013 property taxes at $1,688,165.[1]

¶ 6        On February 3, 2014, DSI appealed the Local Board's assessment of $1,688,165 to respondent, the PTAB, under section 16-160 of the Property Tax Code (*id.* § 16-160), arguing that the Local Board erred when calculating Heritage Woods's fair cash value under section 10-390 of the Property Tax Code (*id.* § 10-390), which states:

> "(a) Notwithstanding Section 1-55, to determine the fair cash value of any supportive living facility established under Section 5-5.01a of the Illinois Public Aid Code, in assessing the facility, a local assessment officer must use the income capitalization approach.
>
> (b) When assessing supportive living facilities, the local assessment officer may not consider:
>
>> (1) payments from Medicaid for services provided to residents of supportive living facilities when such payments constitute income that is attributable to services and not attributable to the real estate; or

---

[1]The Local Board has not filed a brief on appeal.

3

> (2) payments by a resident of a supportive living facility for services that would be paid by Medicaid if the resident were Medicaid-eligible, when such payments constitute income that is attributable to services and not attributable to real estate."

¶ 7 On April 16, 2014, petitioner, the School District, filed a request to intervene in the PTAB proceedings. The PTAB granted this request on April 29, 2014.

¶ 8                                     A. The PTAB Hearing

¶ 9 On April 11, 2017, the PTAB held a hearing on the 2013 property tax assessment of Heritage Woods. The hearing focused on the fair cash value of Heritage Woods as of January 1, 2013, under section 10-390. The PTAB received testimony from David Mitchell, Chief Financial Officer and Vice President of Gardant Management Solutions, Inc. (Gardant), which manages Heritage Woods, and three certified general real estate appraisers—Keith Honegger, Michael MaRous, and Eric Dost. We recount each witness's testimony below.

¶ 10                                       1. David Mitchell

¶ 11 Mitchell began his testimony by distinguishing supportive living facilities, such as Heritage Woods, from assisted living facilities. Mitchell stated assisted living facilities are market rate facilities that do not follow the same statutory guidelines as supportive living facilities. According to Mitchell, for Medicaid-eligible residents, supportive living facilities "agree to accept rent *** from the resident *** [in an amount equal] to their Social Security income less $90" and to "accept in full the Medicaid payment that is paid [for services] based on *** seven different regions" in Illinois. While assisted living facilities can have asking rental rates that are similar to those of supportive living facilities, an assisted living facility's service rates vary according to the market. Further, assisted living facilities, generally, are not reimbursed for Medicaid-eligible residents.

4

¶ 12    Next, Mitchell reviewed the Department's 2013 schedule of estimated monthly revenues for a supportive living facility (Department's schedule). The purpose of the Department's schedule is "to give estimated monthly revenue for operational supportive living facilities for providing housing and services to Medicaid-eligible residents." The estimated monthly revenues adopted by the Department vary according to Illinois region and include "funds paid by a resident for room and board, the Supplemental Nutrition Assistance Program (SNAP) allocation from a resident, and funds paid by the Department *** for services rendered to a Medicaid-eligible resident."

¶ 13    The Department's schedule estimated that the monthly revenue received for room and board from a single Medicaid-eligible resident of a supportive living facility was $620. Mitchell said this amount represented the minimum social security income ($710) minus a personal expense allocation ($90). Although a resident's social security income may exceed $710, the Department caps the room and board charge at $620 for that single resident of the supportive living facility. Excess social security funds are "applied to the Medicaid services portion of their stay." Service rates can be higher for private-pay residents, since, for Medicaid-eligible residents, the supportive living facility agrees to accept the rate provided by Medicaid. Nevertheless, the exact same services are provided to Medicaid-eligible and private-pay residents.

¶ 14    Mitchell was asked about the package price quoted to prospective residents of Heritage Woods. He stated the quoted package price would depend upon the type of apartment selected by the prospective resident. However, the quoted package price would include both room and board and services. Often, the prospective resident and his or her family have questions about financing, namely, whether the prospective resident will qualify for Medicaid or pay privately. Mitchell stated the quoted package price of a studio apartment at a supportive living facility, depending on that facility's location, might be around $3200.

5

¶ 15 Payments from residents of Heritage Woods are processed electronically and allocated between room and board and services. For example, if a resident receives $750 from social security each month, then $620 would be allocated as room and board, $90 would be allocated as a personal expense, and the excess of $40 would be allocated as services. Thus, all residents have the same room and board allocation, with any excess funds after the personal expense allocation going towards services.

¶ 16 On cross-examination, Mitchell was asked how a supportive living facility is permitted to apply funds exceeding the mandated $620 room and board rate to "the Medicaid services portion of their stay." Mitchell cited section 146.225(c) of Title 89 of the Administrative Code, 89 Ill. Adm. Code 146.225(c) (2018), which states: "Any income remaining after deduction of the protected minimum of $90 and room and board charges shall be applied first towards medical expenses not covered under the Department's Medical Assistance Program. Any income remaining after that shall be applied to the charges for *** services paid by the Department."

¶ 17 Mitchell agreed that there is a real estate component contained in Heritage Woods's total package prices that is not covered by the Department's $620 rate. This is because $620 is allocated as each resident's room and board rate, despite differences in the size of each resident's apartment. For example, the difference in the asking rental rate for a studio apartment ($3425) and one-bedroom apartment ($3750) is $325. This $325 amount is allocated to the resident's services even though he or she is receiving the exact same services as all other residents. This example can also be applied to one-bedroom, double-occupancy, and two-bedroom, double-occupancy, apartments, where the difference is $600. Mitchell agreed a resident is charged "more for the exact same services because [he or she] live[s] in a bigger room."

¶ 18    Mitchell also testified to the occupancy of the one-bedroom apartments at Heritage Woods. Mitchell had the following exchange with the School District's attorney:

"Q. All right. Well, let me get the point. Isn't it true that each of your single bedrooms are code certified double—they can have two occupants under the code?

A. A single bedroom?

Q. Yes. A one-bedroom can have two occupants per—they're large enough to—under the code to have two residents per single bedroom; correct?

A. I believe that is correct. I don't have the square footage in front of me for that building. Every one of our communities is designed by a different—necessarily a different architect and have different square footages of the room.

We do have to follow the minimum code that's provided under the administrative code. And, as you stated, a studio has to be a minimum of 300 and *** 450 for a double occupied.

* * *

Q. *** I just want to—This is an important point that I want to establish, that one-bedrooms are 506 square feet? I'm showing you what—I've handed you a floor plan for the one-bedroom unit.

A. Okay.

Q. Isn't it true that 23 by 22 is the dimensions shown?

A. According to this, yes.

Q. And that would be a 506-square-foot unit?

A. I agree with you."

¶ 19    Further, Mitchell confirmed, as depicted on the Department's schedule, a supportive living facility receives approximately $106 per Medicaid-eligible resident from SNAP. Likewise, a supportive living facility receives approximately $2171 per Medicaid-eligible resident from Medicaid. This is the maximum amount received per Medicaid-eligible resident for services, calculated using 60% of the nursing home rates compiled from cost reports. Mitchell believed this rate was *per diem* based on income levels and costs of services in the region. Mitchell disagreed that there was a capital component, estimating value based on real estate, to the Medicaid rate. In total, the Department's schedule estimated the monthly revenue of a supportive living facility from a Medicaid-eligible resident was $2897 in 2013 ($620 + $106 + $2171).

¶ 20    In rebuttal, Mitchell stated the potential gross income of a supportive living facility is calculated by the number of units times the rent amount plus a vacancy factor, rather than by the capacity of the building times a rent amount.

¶ 21                          2. Keith Honegger

¶ 22    Honegger was hired by DSI to complete an appraisal of Heritage Woods as of January 1, 2013. Honegger is a certified general real estate appraiser, but he is not a member of the Appraisal Institute and he has not completed 3000 hours of peer-reviewed work or a demonstrative appraisal of a complex property.

¶ 23    Honegger testified that he could have labeled his report an appraisal report rather than a restricted use report. Regardless, Honegger stated it is unclear whether a restricted use report can be used by more persons than just the client. Honegger explained that, in this case, the report was restricted because he did not want the appraisal report to be used for a market value sale.

¶ 24    Honegger calculated the fair cash value of Heritage Woods under section 10-390's income capitalization approach, which he believed required the use of actual rental income. As such,

8

Honegger calculated potential gross income from room and board using the Department's schedule's mandated $620 rate for the 37 studio and 44 one-bedroom apartments. Honegger used the Department's schedule's mandated $886 room and board rate for the 6 two-bedroom apartments. Honegger concluded Heritage Woods's potential gross income from room and board totaled $666,432 (($620 x 37 single-occupancy, studio units) + ($620 x 44 single-occupancy, one-bedroom units) + ($886 x 6 double-occupancy, two-bedroom units) x 12 months).

¶ 25        However, Honegger testified that potential gross income from room and board includes food costs. To calculate only potential gross rental income, Honegger subtracted food costs before adding SNAP revenue. In 2012, the food costs at Heritage Woods were $139,444. The SNAP revenue at Heritage Woods totaled $68,816 in 2012. Using the maximum, full occupancy, potential gross income of Heritage Woods in 2012 ($656,592), Honegger calculated the potential gross rental income at Heritage Woods in the amount of $585,964 (($656,592 - $139,444) + $68,816). With a vacancy rate of less than 1%, Honegger opined effective gross rental income at Heritage Woods totaled $580,964.

¶ 26        Next, Honegger calculated the operating expenses of Heritage Woods. Honegger testified that a supportive living facility's operating expenses are commingled between rent and services, so there is no way to individually subtract the expenses for rent under section 10-390 of the Property Tax Code. However, Honegger developed a method for estimating the operating expenses of Heritage Woods by comparing supportive living facilities to properties financed under section 42 of the Internal Revenue Code, 26 U.S.C. § 42 (2012).

¶ 27        Honegger explained that there are 118 supportive living facilities outside of Cook County, 26% of which have living portions financed by section 42. Honegger believed observing the expense ratios of 14 "strict" section 42 properties, which do not provide services, would allow him

to predict the expense ratios of section 42 properties with supportive living components. Supportive living facilities operate identically, so a "living portion [of a supportive living facility] that's not a Section 42 [property] would *** have a similar expense ratio."

¶ 28    After reviewing the data, Honegger concluded the 14 "strict" section 42 properties had, on average, a 68.6% expense ratio. Two "strict" section 42 properties that were "most comparable" to Heritage Woods had a 63.4% expense ratio on average. Honegger concluded from this data that Heritage Woods would have an expense ratio between 61% and 65.7%.

¶ 29    Moreover, Honegger reviewed data from 17 other supportive living facilities managed in Illinois by Gardant. The operating expenses of those properties ranged from 46.5% to 79.5%. However, the average expense ratio was 61% and 62% in 2011 and 2012, respectively. Honegger noted that these percentages closely aligned with the 63.4% average expense ratio of the "most comparable" "strict" section 42 properties. Therefore, the data indicated "the expense side of [a supportive living facility] for services is similar to the expense side *** for rent."

¶ 30    Ultimately, Honegger concluded that the lower end of the range of data was most appropriate for Heritage Woods. As a result, Honegger used a 61% expense ratio to calculate net income. Initially, Honegger multiplied the expense ratio (61%) by effective gross rental income ($580,964) to calculate the operating expenses of Heritage Woods at $354,388. Honegger then subtracted operating expenses ($354,388) from effective gross rental income ($580,964) to calculate the net operating income of Heritage Woods at $226,576. Applying a capitalization rate of 0.111, Honegger concluded that the fair cash value of Heritage Woods under the income capitalization approach was $2,041,225 ($226,576 / 0.111) as of January 1, 2013.

¶ 31    On cross-examination, Honegger was asked about the Department's $620 room and board rate applying to all occupants of studio and one-bedroom apartments, despite the differences in

10

size of those apartments. Honegger did not believe he had to reconcile these differences in size as part of his analysis of the fair cash value of Heritage Woods. Honegger stated, based upon the information he was given by DSI, the $620 room and board rate applied to both studio and one-bedroom apartments.

¶ 32    Similarly, Honegger stated, based upon the information he was given by DSI, the two-bedroom apartments were the only double-occupancy units at Heritage Woods. However, Honegger agreed that the maximum occupancy of Heritage Woods was 137 residents. Thus, it had to be possible for a one-bedroom apartment to house two occupants for a potential gross income of $886 per month, rather than house one occupant for a potential gross income of $620 per month. By extension, Honegger agreed that, under his methodology, Heritage Woods could gross a potential income of $806,880 (($620 x 37 single-occupancy, studio units) + ($886 x 44 double-occupancy, one-bedroom units) + ($886 x 6 double-occupancy, two-bedroom units) x 12 months).

¶ 33    When questioned by the hearing officer, Honegger confirmed his belief that actual rents, *i.e.*, the room and board rates stated on the Department's schedule, rather than market rents, must be used to value supportive living facilities. This was because the law "forc[es] these people to have a rent that's below market *** [and] that's what the property produces economically."

¶ 34                                    3. Michael MaRous

¶ 35    MaRous is a certified general real estate appraiser who was hired by the School District to complete an appraisal of Heritage Woods as of January 1, 2013. MaRous is a member of the Appraisal Institute and has appraised real estate for over 40 years, lectured in various appraisal settings, published articles, and has been cited in approximately 15 books on appraising.

¶ 36    As part of his appraisal, MaRous emphasized the income capitalization approach, required by section 10-390 of the Property Tax Code, but used the sales comparison approach as a check.

11

To estimate potential gross rental income, MaRous considered Heritage Woods's asking rents of $3425 for a studio apartment; $3750 for a one-bedroom, single-occupancy, apartment; $4550 for a one-bedroom, double-occupancy, apartment; $4850 for a two-bedroom, single-occupancy, apartment; and, $5150 for a two-bedroom, double-occupancy, apartment. MaRous opined that there was a $325 difference in the asking rent of a studio apartment and a one-bedroom, single-occupancy, apartment due to "the benefit of having the bigger apartment." MaRous attempted to segregate the value of real estate from services by grossing the income and deducting the service costs.

¶ 37    Moreover, MaRous considered (1) the rents of five comparable properties, which were identified as independent or assisted living but not supportive living facilities, (2) past rent levels at Heritage Woods, (3) market surveys and trends, and (4) "the fact that 50, 55 percent of the subject [facility's population] is generally Medicaid[-eligible]." MaRous considered the Department's schedule for Medicaid-eligible residents, but, in his view, the stated room and board rates depicted allocated rates that did not account for geographic location. Thus, asking rents were more applicable to the market value of the real estate. Asking rents included "goods and services that [we]re not related to *** real estate," but "nonreality sources of rental income [were] offset by the expenses of these goods and services."

¶ 38    Ultimately, MaRous stabilized the market rental rates of Heritage Woods to develop potential gross income. He used $2900 for the 37 studio apartments, $3500 for the 44 one-bedroom apartments, and $3700 for the 6 two-bedroom apartments, yielding a stabilized rental income of $3,402,000 (($2900 x 37 studio apartments) + ($3500 x 44 one-bedroom apartments) + ($3700 x 6 two-bedroom apartments) x 12 months). MaRous found Heritage Woods had occupancy rates of

12

99.5% in 2009, 99.6% in 2010, 99% in 2011, and 98.7% in 2012, so he used a 2.5% vacancy rate to calculate Heritage Woods's effective gross rental income at $3,316,950.

¶ 39    Next, MaRous testified to Heritage Woods's operating expenses. MaRous generated stabilized operating expenses with data from Heritage Woods's comparative income statements between 2010 and 2012. From his review of this data and the exclusion of nonrealty expenses for goods and services, MaRous concluded that 83.5% was an appropriate expense ratio to calculate net operating income. MaRous multiplied this expense ratio by effective gross rental income ($3,316,950) to calculate the operating expenses of Heritage Woods at $2,768,650.[2] MaRous then subtracted operating expenses ($2,768,650) from effective gross rental income ($3,316,950) to calculate Heritage Woods's net operating income at $548,300. MaRous confirmed his belief that this figure excluded income for services. Applying a capitalization rate of 0.1067, derived from RealtyRates.com, a band of investments technique, and the addition of a real estate tax load, MaRous concluded the fair cash value of Heritage Woods under the income capitalization approach was approximately $5,138,707 ($548,300 / 0.1067) as of January 1, 2013. MaRous reconciled this calculation with his calculations under the sales comparison approach, then finally concluded Heritage Woods had a fair cash value of $5,150,000 as of January 1, 2013.

¶ 40    On cross-examination, MaRous said he considered Heritage Woods to be an assisted living facility, but that it could also be considered a supportive living facility. MaRous indicated that Medicaid assistance was the only primary difference between the two types of facilities.

¶ 41    Further, MaRous restated his belief that he excluded income from services when valuing Heritage Woods under the income capitalization approach. MaRous said he grossed up the income and took out all the expenses allocated to both real estate and service income. MaRous agreed that

---

[2]We note that 83.5% of $3,316,950 is actually $2,769,653.25.

13

although he did not deduct service income from potential gross income, he deducted service income from operating expenses. MaRous then stabilized operating expenses with three years of operating expenses from Heritage Woods. MaRous believed this complied with section 10-390 of the Property Tax Code because he removed all the expenses attributable to services.

¶ 42 However, when asked by the hearing officer if he "really allocated out just the services portion," MaRous said "[n]o[,] I wasn't able to because of the way these things are run." Likewise, on redirect examination, MaRous was asked "does your net operating income before deduction for real estate taxes include income for services?" MaRous responded, "[g]enerally not, but it does include [services] for food *** [a]nd basic services within the monthly package." MaRous also agreed if a Medicaid-eligible resident receives more than $620, then the excess funds reduce the services paid by Medicaid and are not kept by a supportive living facility.

¶ 43                                      4. Eric Dost

¶ 44 Dost is a certified general real estate appraiser who was hired by the School District to review Honegger's appraisal of Heritage Woods. Dost is a member of the Appraisal Institute who, in his career, has conducted between 200 and 300 review appraisals.

¶ 45 Initially, Dost stated Honegger's report was a restricted use report, which is intended for a single user, the client. According to Dost, if there are other users, such as a local board or the PTAB, then it is improper to complete a restricted use report instead of an appraisal report. The level of detail is the difference between the two types of reports. Dost said Honegger omitted certain sections that would be included in an appraisal report, but admitted that, in theory, a restricted use report does not result in a different fair cash value than an appraisal report.

¶ 46 Dost also recognized that section 10-390 of the Property Tax Code requires valuations under the income capitalization approach. He did not believe the Department's schedule for room

14

and board, utilized by Honegger, reflected market rates of supportive living facilities. Dost opined that Heritage Woods was "getting higher rents for its private pay rates." Further, Dost testified that the Medicaid rate on the Department's schedule is derived from 60 percent of the average nursing facility Medicaid rate within the region and is a compilation of costs with a nursing component, support services component, and capital component. He believed the Department's schedule for Medicaid rates included real estate and services because a capital component is built into that cost and the supportive living portion that includes real estate.

¶ 47      Dost stated that Honegger's appraisal failed to account for sources of revenue at Heritage Woods, including income from the beauty salon and the convenience store. Regarding operating expenses, Honegger's analysis appeared to be based largely on overall expense ratios of section 42 properties, when traditionally this analysis would include itemizing individual categories of expenses. Dost did not know the occupancy rates or rent restrictions of Honegger's section 42 properties, which Dost said could be skewing operating expenses. Honegger's calculations could also be skewed by below average revenues and above average costs.

¶ 48      When asked about calculating potential gross income with Heritage Woods's maximum occupancy of 137 residents, Dost said he would consider the percentage of occupied units and the licensed capacity. Dost stated it really comes down to how a second resident of an apartment is treated. Ultimately, Dost concluded that Honegger's report was not credible or reliable.

¶ 49                                    B. Decision of the PTAB

¶ 50      On June 19, 2018, the PTAB issued a detailed decision to the parties, finding "the preponderance of the evidence *** indicate[d] a reduction in the *** assessment [of Heritage Woods] [w]as warranted." The PTAB relied primarily on the appraisals and testimony of Honegger and MaRous, recognizing that they agreed on the basic methodologies for valuing

15

supportive living facilities under section 10-390's income capitalization approach. Indeed, the PTAB noted it was undisputed that this approach required the appraisers to "derive a value indication for [the] income-producing property by converting its anticipated benefits *** into property value." This is done by "convert[ing] one year's income expectancy (potential gross operating income less operating expenses) by applying a market-derived capitalization rate."

¶ 51     However, the PTAB also acknowledged that there were "extreme divergent opinions" between Honegger and MaRous. Therefore, the PTAB found it was "appropriate to examine the data and compute" the fair cash value of Heritage Woods under the income capitalization approach required by section 10-390, "using proper rents[,] which exclude income and expense[s] from services[,] and the appropriate rate of estimated vacancy."

¶ 52     With respect to potential gross rental income, the PTAB found Honegger's calculation of $585,964, derived from the actual rents of Heritage Woods in 2012, $656,592, was "better supported" than that of MaRous. With respect to MaRous's comparables, the PTAB found:

> "MaRous incorrectly lumped supportive living, assisted living, independent living and senior living facilities together. The testimony revealed he considered them to be the same, however, technically, for purposes of his appraisal he testified he should have called them supportive living facilities. The testimony depicts the latter two are not Medicaid certified facilities, offer different amenities, have different layouts, and obtain different market rents based on private pay residents. The record further depicts [Heritage Woods], as a supportive living facility, has monthly rent that is dictated by the Illinois Supportive Living [Facilities] Program as shown by [the Department's schedule]."

16

From these findings, the PTAB concluded that MaRous "grossly overstated [Heritage Woods]'s estimated potential gross income based on the comparables used to stabilize *** rental income." In the absence of market comparables and in light of the "unique characteristics, mandates and rental restraints of" supportive living facilities, the PTAB found Heritage Woods's "actual rents" were "more indicative of market rents than the market rents developed by MaRous."

¶ 53    Even though Honegger's estimate was "better supported," the PTAB found he should have included income from the incidental amenities, such as the beauty salon and the convenience store. With these additions, plus SNAP revenues and minus food costs, the PTAB concluded the potential gross income of Heritage Woods was $605,337. After considering the occupancy rates used by Honegger and MaRous, the PTAB found a 1% vacancy rate was reasonable to calculate effective gross income. Using this vacancy rate, the PTAB found the effective gross operating income of Heritage Woods, when rounded, was $600,000.

¶ 54    With respect to operating expenses, the PTAB prefaced its findings by stating it agreed that "the expenses for a supportive living facility are commingled and intertwined among the various services offered by the facility, making it difficult *** to allocate out expenses for services," as required by section 10-390. Nevertheless, the PTAB found Honegger's method for calculating operating expenses, based upon an examination of section 42 properties, was "credible, verifiable and better supported through the testimony."

¶ 55    Conversely, the PTAB rejected MaRous's conclusions on operating expenses, which were derived from the stabilized operating expenses of Heritage Woods between 2010 and 2012. The PTAB noted that MaRous "grossed up the income and took out all expenses allocated to both real estate and service income." However, the PTAB found "this method was questionable" because, during cross-examination, "MaRous was unable to indicate where he deducted service income and

17

where he excluded service expense." Further, when asked whether his net operating income included income for services, MaRous testified "[g]enerally not, but it does include [services] for food *** [a]nd basic services within the monthly package." Thus, the PTAB found "the method developed by MaRous [wa]s not credible because he could not definitively state nor verify with certainty that his calculations did not include service income." The PTAB applied the 61% expense ratio derived by Honegger to its $600,000 effective gross operating income to calculate operating expenses at $366,000 ($600,000 x .61).

¶ 56    Regarding the capitalization rate, the PTAB found Honegger and MaRous were "fairly in agreement." Honegger derived a capitalization rate of 0.111 and MaRous derived a capitalization rate of 0.1067. Based upon the evidence, the PTAB concluded "an overall loaded capitalization rate" of 0.1085 was "well supported."

¶ 57    From these calculations, the PTAB concluded Heritage Woods had a 2013 fair cash value of $2,156,682 under section 10-390's income capitalization approach. To arrive at this figure, the PTAB calculated the net operating income of Heritage Woods by subtracting operating expenses ($366,000) from effective gross operating income ($600,000) for a total of $234,000. The PTAB then divided net operating income ($234,000) by the capitalization rate (0.1085), which yielded a fair cash value of $2,156,682. Next, under section 1-55, the PTAB multiplied Kankakee County's "three-year median level of assessments" (33.11%) by the fair cash value of Heritage Woods ($2,156,682) to reduce that property's 2013 tax assessment from $1,688,165 to $714,077.

¶ 58    On June 21, 2018, the School District filed a timely petition for direct review of the PTAB's decision under Illinois Supreme Court Rule 335(a) (eff. July 1, 2017), section 16-195 of the Property Tax Code, 35 ILCS 200/16-195 (West 2012), and section 1910.74(a)(2) of Title 86 of the Administrative Code, 86 Ill. Adm. Code 1910.74(a)(2) (2000).

18

¶ 59                                    II. ANALYSIS

¶ 60          In this appeal, our direct review is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2016)) and may "extend to all questions of law and fact presented by the entire record." *Id.* § 3-110; see *Kankakee County Board of Review v. Property Tax Appeal Board*, 337 Ill. App. 3d 1070, 1074 (2003) (*Kankakee County I*). Broadly construed, the School District challenges the PTAB's reduction of Heritage Woods's 2013 property tax assessment on two alternative bases. First, the School District asserts that the PTAB's decision was based upon an incorrect method for applying the income capitalization approach required by section 10-390. Second, the School District argues that the PTAB's decision was arbitrary and capricious.

¶ 61          The logical starting point for our analysis is to begin with a summary of the applicable statutes that govern real estate valuation for purposes of taxation. Typically, under section 1-50 of the Property Tax Code, 35 ILCS 200/1-50 (West 2012), "[f]air cash value" for purposes of a tax assessment is defined as "[t]he amount for which a property can be sold in the due course of business and trade, not under duress, between a willing buyer and a willing seller."

¶ 62          In the context of section 1-50, "fair cash value" is synonymous with "fair market value" and "an arm's-length sales transaction is the best evidence thereof." *Kraft Foods, Inc. v. Illinois Property Tax Appeal Board*, 2013 IL App (2d) 121031, ¶ 43; *Kankakee County I*, 337 Ill. App. 3d at 1074; accord *Gateway-Walden, LLC v. Pappas*, 2018 IL App (1st) 162714, ¶ 33. Absent a market value from an arm's-length sale, the sales comparison approach is the preferred method for valuing real estate in Illinois. *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 43.

¶ 63          However, our legislature expressly adopted the "income capitalization approach" for purposes of determining "the fair cash value of any supportive living facility." 35 ILCS 200/10-390(a) (West 2012); see also *Petersen Health Systems, Inc.*, Ill. Prop. Tax App. Bd., No. 15-

00693.001-C-2, at 21 (Jan. 15, 2019), http://www.ptab.illinois.gov/web/Decisions/2015/2015-00693.pdf [https://perma.cc/7LYN-XDYA] (PTAB finding "the provisions of Section 10-390 are not couched in terms of determining traditional fair market value, but rather [in] *** using a unique, different and non-traditional appraisal analysis utilizing a modified income capitalization approach to value"). An appraiser may not consider income in the form of "payments from Medicaid for services provided to residents *** when such payments constitute income that is attributable to services and not attributable to the real estate." 35 ILCS 200/10-390(b)(1) (West 2012). Likewise, an appraiser may not consider "payments by a resident *** for services that would be paid by Medicaid if the resident were Medicaid-eligible, when such payments constitute income that is attributable to services and not attributable to real estate." See *id.* § 10-390(b)(2). The assessment at issue pertains to a supportive living facility and requires our consideration of section 10-390.

¶ 64                                  A. Standard of Review

¶ 65        Initially, the parties disagree on the standard of review. The School District argues both contentions of error should be reviewed *de novo*, since they involve questions of law and statutory interpretation. Conversely, the PTAB asserts our review must be deferential and based upon the manifest weight of the evidence standard. As support for this assertion, the PTAB contends that the appropriate valuation method is undisputed and our review is restricted to the PTAB's acceptance of Honegger's, and not MaRous's, application of the income capitalization approach. DSI has not requested a specific standard but indicates *de novo* review is appropriate.

¶ 66        It is well accepted that administrative review proceedings may present questions of law, fact, or law and fact. *John J. Moroney & Co. v. Illinois Property Tax Appeal Board*, 2013 IL App (1st) 120493, ¶ 36. The PTAB's findings on questions of law are reviewed *de novo*, " 'rendering

20

our review "independent and not deferential." ' [Citation]." *Cook County Board of Review v. Property Tax Appeal Board*, 403 Ill. App. 3d 139, 143 (2010). It is notable that our supreme court, while not in the context of section 10-390, found a question involving the proper method for employing the income capitalization approach was one of law. See *Kankakee County Board of Review v. Property Tax Appeal Board*, 131 Ill. 2d 1, 6, 14-15 (1989) (*Kankakee County II*).

¶ 67    The PTAB's findings on questions of fact are "held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 2016). It is not the role of a reviewing court to "reweigh the evidence, reassess the credibility of the witnesses, substitute its judgment for that of the PTAB, or make an independent determination of the facts," as these jobs are uniquely within the province of the PTAB. *Kraft Foods*, 2013 IL App (2d) 121031, ¶ 51; *National City Bank of Michigan/Illinois v. Property Tax Appeal Board*, 331 Ill. App. 3d 1038, 1042-43 (2002). The PTAB's findings on questions of fact are disturbed only if against the manifest weight of the evidence, meaning all reasonable and unbiased persons would agree the decision is erroneous and an opposite conclusion is clearly evident.[3] *Kankakee County I*, 337 Ill. App. 3d at 1074.

¶ 68    In the context of reviewing whether the PTAB's reduction of a property tax assessment should be upheld or set aside, our supreme court has stated that a reviewing court is "not charged with the responsibility of determining the [fair cash value] of the subject property." *Kankakee County Board of Review v. Property Tax Appeal Board*, 226 Ill. 2d 36, 50 (2007) (*Kankakee County III*). Our court simply decides whether the PTAB's decision to reduce the property tax assessment was correct, a question that turns on "whether petitioner employed a proper valuation method." *Id.* As stated in *Kankakee County III*, such a review is *de novo*. *Id.* at 51. The present

---

[3]None of the parties argue that this appeal involves a mixed question of law and fact, necessitating a review for clear error. See *Moroney*, 2013 IL App (1st) 120493, ¶ 36. We agree because the historical facts are not admitted or clearly established as to make the issue whether those facts satisfy an undisputed rule of law. See *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 273 (2009).

appeal turns on this precise question, so we conduct an " ' "independent and not deferential" ' " *de novo* review. See *Cook County Board*, 403 Ill. App. 3d at 143; *Kankakee County III*, 226 Ill. 2d at 50-51; see also *Kankakee County II*, 131 Ill. 2d at 6, 14-15; *Kraft Foods*, 2013 IL App (2d) 121031, ¶¶ 42, 44.

¶ 69 Nonetheless, we recognize that the PTAB has an abundance of expertise and familiarity with the complex issues arising from property taxation. Further, we would be remiss if we did not acknowledge the PTAB's 25-page written decision was very thorough. In fact, the PTAB's decision included a comprehensive recitation of the testimony and evidence presented at the administrative hearing, which was helpful to this court. However, since our review is restricted to examining the valuation methodology alone, it is not necessary to "delve into the minutiae of expert testimony or make credibility determinations." See *Pappas*, 2018 IL App (1st) 162714, ¶ 64. Therefore, we conclude the manifest weight of the evidence standard does not apply. Even if it did, that deferential standard of review would not change the outcome of this appeal, as discussed below. We now turn our attention to the School District's contentions of error.

¶ 70     B. Method for Calculating Fair Cash Value Under Section 10-390

¶ 71 The School District contends that the evidence presented by DSI to the PTAB was gathered by means of an inherently flawed methodology with respect to income capitalization. According to the School District, the PTAB improperly granted a reduction in the assessment by considering the amount of actual income DSI attributes to rent in its business records, rather than the potential capacity for Heritage Woods to receive rental income. The School District alleges that the flawed methodology resulted in an artificially low fair cash value for Heritage Woods.

¶ 72 DSI disagrees and submits that this court should conclude the PTAB's approach to income capitalization was correct. According to DSI, the actual rental income and the potential capacity

22

for rental income at Heritage Woods were the same amount. As support, DSI asserts it could not "charge its tenants more than the published allowances by the Department['s]" schedule. Thus, the Department's room and board rates "are to be used in calculating income." For the reasons discussed below, we find DSI's view is oversimplistic and legally incorrect.

¶ 73        In *Kankakee County II*, our supreme court discussed how, in some situations, "actual rental income" is not the correct measure of a property's capacity to generate income. See *Kankakee County II*, 131 Ill. 2d at 15-16. This is such a situation for Heritage Woods.

¶ 74        In *Kankakee County II*, our supreme court found:

> "When actual rental income does not reflect the income-earning capacity of property, it may be disregarded, and the taxing authority may look to rents obtainable for comparable property in the open market. Where actual income truly reflects the income-earning capacity of the property, however, it may not be ignored simply because it does not coincide with rents obtainable on the open market." *Id.* See also *Town of Cunningham v. Property Tax Appeal Board*, 225 Ill. App. 3d 760, 765 (1992) (*Kankakee County II*, while based on "government subsidized housing," "discusses basic legal principles of property valuation.").

To be even more clear, our supreme court emphasized, "it is the capacity for earning income, rather than the income actually derived, which reflects "fair cash value" for taxation purposes.' " *Kankakee County II*, 131 Ill. 2d at 17 (quoting *Springfield Marine Bank v. Property Tax Appeal Board*, 44 Ill. 2d 428, 431 (1970)); see also *Lake County Board of Review v. Property Tax Appeal Board*, 172 Ill. App. 3d 851, 856-57 (1988) (finding it improper to "disregard the contract rent" where that contract rent reflected "the complex's capacity to earn income").

¶ 75    Initially, we note that Heritage Woods has 87 total units. When calculating Heritage Woods's potential gross income from those units, Honegger ignored the potential for Heritage Woods to receive real estate income based on the double-occupancy of some one-bedroom units. Therefore, we agree with the School District's observation that Heritage Woods's potential gross income should not have been based on an assumption that all income generated from its 44 one-bedroom units was limited to the amount of rent paid by a single occupant of each unit.

¶ 76    For example, when asked if it was "true that each of [Heritage Woods's] single bedrooms are code certified double [occupancy]," Mitchell answered, "I believe that is correct." This was because he agreed the minimum square footage for double-occupancy units is 450 square feet and one-bedroom units at Heritage Woods are 506 square feet. Rather than accounting for a reasonable number of double-occupancy one-bedroom units when calculating potential gross income, Honegger based his analysis on an assumption that actual rent was only paid as follows: $620 for the 37 studio units; $620 for the 44 one-bedroom units; and, $886 for the 6 two-bedroom units. Even if rental income from double-occupancy one-bedroom units is rare or minimal, the capacity to earn a reasonable amount of this additional real estate income was ignored by Honegger for purposes of Heritage Woods's fair cash value. This resulted in a flawed methodology under the income capitalization approach. See *Kankakee County II*, 131 Ill. 2d at 15-17.

¶ 77    As importantly, Heritage Woods serves more than just Medicaid-eligible, low-income residents, who are charged the Department's fixed fates. The record indicates Heritage Woods housed approximately 50-55% Medicaid-eligible residents and 45-50% private-pay residents during the relevant timeframe.

¶ 78    DSI claims on appeal that it charges all residents a fixed room and board rate because it could not "charge its tenants more than the published allowances by the Department['s]"

schedule." Curiously, DSI has not directed our attention to the authority for this assertion. In fact, section 146.215(d) of Title 89 of the Administrative Code belies DSI's statement that private-pay residents must be charged the Department's fixed rate. See 89 Ill. Adm. Code 146.215(d) (2020). That section states "[i]f the [Supportive Living Program] provider charges a private-pay rate higher than the Medicaid rate," then "not less than" 25% of the facility shall be reserved for Medicaid-eligible persons. *Id.*[4] Contrary to DSI's position, this language reveals that DSI could lawfully charge a private-pay resident a rental rate higher than the fixed rate for Medicaid-eligible residents.

¶ 79 Despite the fact that DSI purports to charge all residents the same amount for room and board, the record indicates the package prices actually paid by Medicaid-eligible and private-pay residents are not the same. As discussed below, DSI charges private-pay residents higher prices than low-income Medicaid-eligible residents for the same square footage and the same services. If the excess income DSI receives from private-pay residents is not entirely comprised of purely service-related income, then the PTAB's decision must be reversed. Next, we consider the nature of the excess income collected by DSI from private-pay residents each month.

¶ 80 DSI's own witness, Mitchell, admitted that some private-pay residents are charged "more for the exact same *services* because [he or she] live[s] in a *bigger room*." (Emphases added.) According to Mitchell, the excess combined room and board and service income that DSI receives from private-pay residents can range from $325 to $600 per month, depending on the size of the

---

[4]We note the full text of section 146.215(d) of Title 89, which permits a supportive living facility to house up to 75% private-pay residents, states: "The [Supportive Living Program] provider shall accept the SSI rate (less the personal allowance) for room and board for Medicaid residents. If the [Supportive Living Program] provider charges a private pay rate higher than the Medicaid rate, the [Supportive Living Program] provider shall reserve not less than 25 percent of its apartments for Medicaid-eligible residents. Those [Supportive Living Program] settings that set a commensurate rate for both private pay and Medicaid-eligible residents are not required to reserve apartments for Medicaid-eligible residents but must accept Medicaid-eligible residents on a first come, first served basis." See 89 Ill. Adm. Code 146.215(d) (2020).

particular apartment. That is, the excess income from private-pay residents is attributable to the differences between DSI's asking prices for studio and one-bedroom apartments ($325) and double-occupancy one-bedroom and double-occupancy two-bedroom apartments ($600). Hence, based on Mitchell's testimony alone, it is clear that DSI is receiving some amount of income attributable to real estate that DSI inaccurately reported to Honegger as excludable income attributable to services.

¶ 81          Mitchell's testimony leads to one conclusion. Namely, the restricted use appraisal the PTAB received from Honegger was predicated on DSI's understated numbers for real estate income, together with excludable, but overstated, numbers for service income DSI collects from private-pay residents. In other words, as Mitchell agreed, there is an income component from real estate, based on the size of the living space, that is labeled entirely as excludable service income by DSI. Thus, Honegger's restricted use appraisal may have reflected DSI's bookkeeping practices but it did not "truly reflect[ ] the income-earning capacity" of Heritage Woods, as discussed by our supreme court in *Kankakee II*. See *Kankakee County II*, 131 Ill. 2d at 15-17. Consequently, Honegger's calculation of fair cash value cannot be described as "more probably true than not true," as was required for DSI to meet the preponderance of the evidence burden of proof. See *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 191 (2005); *National City Bank*, 331 Ill. App. 3d at 1042; 86 Ill. Adm. Code 1910.63(a), (b), (e) (2000).

¶ 82          We acknowledge, generally, that *Kankakee County II* indicates that, under the right circumstances, the actual rents mandated by the Department may be the best measure of income earning capacity under section 10-390. See *Kankakee County II*, 131 Ill. 2d at 15-17. This approach accurately measured Heritage Woods's income earning capacity for the approximately 50-55% Medicaid-eligible residents.

¶ 83    We also acknowledge that the PTAB has allowed the use of those actual rents in more recent decisions, which were decided after the reduction of Heritage Woods's property tax assessment. See *Prairie Winds of Urbana, LP*, Ill. Prop. Tax App. Bd. No. 15-00068.001-C-3, at 10, 27 (July 17, 2018), http://www.ptab.illinois.gov/web/Decisions/2015/2015-00068.pdf [https://perma.cc/6VSL-KY23] (PTAB reducing a subject property's assessment "to reflect the Honegger appraisal report," which had an "income figure [that] was drawn from *** actual [rental] income"); *Petersen Health Systems, Inc.*, Ill. Prop. Tax App. Bd. No. 15-00693.001-C-2, at 19-20 (PTAB reducing a subject property's assessment "commensurate with the appellant's evidence," which was "solely *** [based] upon the published [Department] regional allocation for Medicaid residents at supportive living facilities").

¶ 84    Nonetheless, measuring income earning capacity based on the purported amount of actual rent charged on-the-books at Heritage Woods was not a true measure of the amount of rental income mislabeled by DSI as service income. While the Department's fixed rate for Medicaid-eligible residents governs as the highest amount DSI may charge those Medicaid-eligible residents for room and board, there is no similar restriction on the lowest amount DSI may charge private-pay residents for room and board. If the PTAB's decision were to stand, nothing would prevent DSI from further reducing its actual rents charged to all residents, thereby allowing DSI's bookkeeping to dictate fair cash value. Surely, this was not the legislative intent for section 10-390's income capitalization approach. Since DSI elected to present inaccurate evidence of the actual rental income being paid by private-pay residents, under the guise of service income, the PTAB's decision was not based on an accurate measure of rental income flowing from Heritage Woods's residents to DSI.

27

¶ 85        Putting the occupancy issue aside, the PTAB's decision regarding the fair cash value of Heritage Woods would be correct if the facility was 100% occupied by Medicaid-eligible low-income residents. However, the record indicates that approximately 45-50% of Heritage Woods's residents were private-pay individuals paying higher prices for the same services and the benefit of having a larger apartment. Here, under section 10-390's income capitalization approach, Heritage Woods's fair cash value should have been based on an amount no less than the income earning capacity attributable to the approximately 50-55% Medicaid-eligible residents, where the market rate and the actual rate were the same under the Department's schedule. In addition, the fair cash value of Heritage Woods should have been based on the added true capacity to earn real estate income from the remaining percentage of higher income residents. The capacity to earn real estate income from private-pay residents should have been, but was not, calculated based on the comparable market rate DSI could have received from private-pay residents who were not Medicaid-eligible. Thus, the actual rents DSI claimed to charge should have been disregarded because they did not "truly reflect[ ] the income-earning capacity of the property." See *Kankakee County II*, 131 Ill. 2d at 15-17.

¶ 86        The PTAB and DSI have requested that our court comment on the veracity of MaRous's valuation methodologies and opinions before remanding the matter with directions for the PTAB to enter a decision consistent with this opinion. To clarify, we have not disturbed the PTAB's finding that MaRous's valuation methodologies and opinions were flawed and unreliable.

¶ 87        Now, for reasons discussed at length in this opinion, we have reached a similar conclusion that Honegger's valuation methodologies and opinions were flawed and unreliable due to the understated real estate income from private pay residents and the assumption that one-bedroom units at Heritage Woods do not have the capacity to generate real estate income from two

28

occupants. As stated above, DSI did not sustain its burden of proof with Honegger's restricted use appraisal, which was based on a flawed method for applying the income capitalization approach to fair cash value. See 86 Ill. Adm. Code 1910.63(a), (b), (e) (2000).

¶ 88 Accordingly, a remand is not warranted because the existing record contains only unreliable opinions based on flawed methodologies from Honegger and MaRous, resulting in legally erroneous approaches to income capitalization. See *Cook County Board of Review v. Property Tax Appeal Board*, 384 Ill. App. 3d 472, 478, 487 (2008) (First District reversing the judgment of the PTAB with a limited remand for the reinstatement of the local board assessment, where the determinative issue on appeal resulted in a holding that the method of valuation adopted by the PTAB was legally erroneous). It is understandable that DSI seeks a remand to the PTAB. However, to arrive at a reliable fair cash value for Heritage Woods under the income capitalization approach, the PTAB would be required to reopen proofs and allow the parties to resubmit evidence, including additional expert opinions using proper valuation methodologies. This, in turn, would improperly afford DSI a second opportunity to correct the evidentiary deficiencies that caused its failure to sustain its burden of proof when challenging the correctness of the Local Board's assessment. See *id*. at 484; 86 Ill. Adm. Code 1910.63(a), (b), (e) (2000).

¶ 89 For these reasons, we reverse the PTAB's decision, which was based on an improper method for applying section 10-390's income capitalization approach, to reduce the 2013 property tax assessment of Heritage Woods. We also conclude DSI, by relying on Honegger's restricted use appraisal, failed to sustain its burden of proof. Since this issue is outcome determinative, we do not reach the alternative issue of whether the PTAB's decision was arbitrary and capricious.

## III. CONCLUSION

For the foregoing reasons, we reverse the judgment of the PTAB and direct that the Local Board's assessment be reinstated.

Board decision reversed and remanded with directions.

No. 3-18-0384

| | |
|---|---|
| **Cite as:** | *Manteno Community Unit School District No. 5 v. Illinois Property Tax Appeal Board*, 2020 IL App (3d) 180384 |
| **Decision Under Review:** | Petition for review of order of Illinois Property Tax Appeal Board, No. 13-00178.001-C-3. |
| **Attorneys for Appellant:** | Scott L. Ginsburg and Jessica L. Knox, of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago, for petitioner. |
| **Attorneys for Appellee:** | Thom Moss, of Bickes, Wilson, & Moss, of Decatur, for respondent DSI Manteno Owner, LLC.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Carl J. Elitz, Assistant Attorney General, of counsel), for respondent Illinois Property Tax Appeal Board.<br><br>No brief filed for other respondent. |